# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**BRYAN LEE CIYOU**
Ciyou & Dixon, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE MATTER OF THE PATERNITY OF S.C.: ) | |
| ) | |
| K.C., ) | |
| ) | |
| Appellant - Respondent, ) | |
| ) | |
| and ) | No. 30A01-1107-JP-322 |
| ) | |
| C.C., ) | |
| ) | |
| Appellee - Petitioner. ) | |
| ) | |
| and ) | |
| ) | |
| B.H., ) | |
| ) | |
| Appellee – Intervenor. ) | |

APPEAL FROM THE HANCOCK CIRCUIT COURT
The Honorable Richard Culver, Judge
Cause No. 30C01-0810-JP-156

**March 29, 2012**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

K.C. (Mother) gave birth to a child, S.C., on July 28, 2008. Controversy has existed ever since as to the identity of S.C.'s biological father. Almost from the outset, two men, B.H. and C.C., have sought to establish legal paternity of S.C. Their battle initially was litigated in two separate counties under two separate actions. B.H. initiated his action in Fayette Circuit Court. Somewhat later, and with Mother's cooperation, C.C. initiated a separate action in Hancock Circuit Court. In this appeal, Mother challenges the Hancock Circuit Court's grant of B.H.'s Verified Petition for Relief from Judgment for Fraud Upon the Court, challenging that ruling as the sole issue on appeal.

We affirm.

Mother and C.C. began dating in high school and became sexually active. Mother and C.C. both knew B.H. At some point in time, Mother and B.H. had a sexual relationship. In 2007, Mother was at B.H.'s house when she learned she was pregnant. B.H. arranged for Mother to see a doctor.

Mother informed C.C. that she was pregnant and believed C.C. to be the father, though she had also wondered if B.H. could be the father. Mother ceased contact with B.H. and continued her relationship with C.C. On July 28, 2008, Mother gave birth to S.C. at the Henry County Hospital in Henry County, Indiana, with C.C. present during the birth. On July 29, 2008, B.H. filed a Verified Petition for Immediate Paternity Order in the Fayette Circuit Court, alleging he was the father of S.C., requesting an order that Mother and S.C. submit to a DNA test, and asking that it be performed before Mother's and S.C.'s discharge from the hospital. On July 30, 2008, the Henry County Sheriff served upon Mother a

2

summons and B.H.'s Verified Petition for Immediate Paternity Order by leaving a copy with, and mailing it to, Mother's parents' house. Also on July 30, Mother and C.C. executed a paternity affidavit stating that C.C. was S.C.'s biological father.

On July 31, 2008, before they were discharged from the hospital, Mother and S.C. submitted to blood tests. On August 4, 2008, the DNA Diagnostic Center in Fairfield, Ohio issued a DNA test report indicating there was a 99.9997% probability that B.H. was S.C.'s biological father.[1] On August 15, 2008, Mother's counsel entered his appearance in the Fayette County proceeding. On the same day, Mother filed a Verified Answer and a Motion to Dismiss for a lack of subject matter jurisdiction, failure to state a claim, and improper venue. On August 26, 2008, the Fayette Circuit Court scheduled a hearing on Mother's motion to dismiss.

On October 15, 2008, the DNA test results were sent to Mother and B.H. On October 21, 2008, C.C., *pro se*, and on behalf of S.C., filed a Verified Petition to Establish Paternity in the Hancock Circuit Court. C.C. alleged that he was S.C.'s father based upon the July 30 paternity affidavit. On the same day, i.e., October 21, both Mother and C.C. filed a Verified Joint Stipulation Establishing Paternity and Agreed Entry (Agreed Entry), stipulating to C.C.'s paternity and determining the parties' support obligations and custodial arrangements relative to S.C.

On October 22, 2008, the Hancock Circuit Court issued an order establishing paternity

---

[1] *See* I.C. § 31–14–7–1(3) (West, Westlaw through end of 2011 1st Regular Sess.) ("[a] man is presumed to be a child's biological father if ... the man undergoes a genetic test that indicates with at least a ninety-nine percent (99%) probability that the man is the child's biological father").

(the Paternity Order) in favor of C.C. On that same day, the Fayette Circuit Court held a hearing on B.H.'s paternity action. During the hearing, Mother's counsel served B.H. with documents from the Hancock County proceeding and entered them into evidence without objection from B.H. Although B.H. sought to enter the DNA test report into evidence, the trial court refused and dismissed B.H.'s Petition, stating:

> Well that maybe [sic] all well and good that you did it but you have another hurdle you have got to get over um, that is that your Petition To Dismiss um, or that your Petition doesn't really set out any, um any remedy for which I could give belief [sic] to. It doesn't state that you are the father. It doesn't … it's not a Petition for Paternity. It was only a Petition asking that you be given an immediate uh, that you be, that she be ordered to do a DNA testing. Um, we never got to that stage, it's and, and it doesn't meet any of the requirements. Um, so in reality the Petition has to be dismissed um, subject to your filing an Amended Complaint within 10 days.
>
> * * * * *
>
> And it has to be in the proper form because if you filed it and it's not in proper form, then, doesn't set out the appropriate facts, it's going to be dismissed and then other issues come about um, and then we'll end up having a battle between Fayette County and Hancock County to determine if you're [sic] complaint survives to determine um, which Court has jurisdiction um, and I guess you could then file, and if your complaint survives you can file a motion to consolidate in the earliest case and everything would then be consolidated under the earliest case number, if I remember right under Trial Rule 42-something. 42 or 43 said that yesterday that's why I'm familiar. I'm up on it.

*Appellant's Appendix* at 66-67. Following dismissal, on October 31, 2008, B.H. filed a motion to correct error and a motion requesting an extension of time to file an amended complaint. The Fayette Circuit Court did not rule on the motion to correct error, but granted B.H.'s motion for an extension of time. B.H. did not subsequently file an Amended Petition and Mother's counsel withdrew from the Fayette County proceeding on February 27, 2009.

4

On June 25, 2010, B.H., by counsel, filed his Verified Petition for Relief of Judgment for Fraud Upon the Court (the Petition for Relief) in the Hancock Circuit Court, alleging that the Paternity Order was obtained through fraud. On July 16, 2010, B.H. sought to intervene in the Hancock County proceeding. The trial court granted the motion on July 19, 2010. On May 24, 2011, the trial court held a hearing on B.H.'s Petition for Relief. On July 1, 2011, the trial court granted the petition, issuing the following findings of fact, conclusions of law, and judgment:

1. The Court finds [K.C.] and [C.C.], met in high school when [K.C.] was a freshman [C.C.] was a senior [sic].

2. The Court finds were active [sic].

3. The Court finds that by at least 2007, [K.C.] was also sexually active with [B.H.].

4. [S.C.] was born on July 28, 2008.

5. [K.C.] and [C.C.] entered into a Paternity Affidavit at the hospital after [S.C.'s] birth.

6. On July 29, 2008, [B.H.] filed a Petition to Establish Paternity of minor child, S.C., in the Fayette Circuit Court under cause number 21C01-0807-JP-0432.

7. [K.C.], … the biological mother of [S.C.], was named as the Respondent.

8. On July 31, 2008, a DNA test was performed at the Henry County Memorial Hospital on [K.C.], [B.H.] and minor child [S.C.].

9. The DNA testing was completed on August 4, 2008 showing the probability of paternity as it related to [B.H.] was 99.9997%.

10. On August 15, 2008, attorney Bryan Ciyou … entered his appearance on behalf of [K.C.] in the Fayette Circuit Court proceeding.

5

11. Various motions were filed by Ciyou in the Fayette Circuit Court proceeding in response to [B.H.]'s Petition to Establish Paternity, which were:

    a. Motion to Dismiss for Lack of Subject Matter Jurisdiction;
    b. Failure to State a Claim; AND
    c. Incorrect Venue.

12. The Fayette Circuit Court then consolidated all pending motions for final hearing on October 22, 2008 at 10:30 a.m. for one (1) hour.

13. On October 21, 2008, [C.C.] …, the putative father, filed a Petition to Establish Paternity of minor child, S.C., in the Hancock County Circuit Court under cause number 30C01-0810-JP-0156.

14. [K.C.] was named as Respondent in the Hancock County Circuit Court case and on October 21, 2008, Ciyou entered an appearance on behalf of [K.C.].

15. On October 21, 2008, [K.C.] and [C.C.] filed a Verified Joint Stipulation Establishing Paternity and Agreed Entry, hereinafter, Agreed Entry.

16. The Court finds that [K.C.] knew that there was a reasonable possibility that [B.H.] was the biological father of [S.C.].

17. The Agreed Entry was signed by Ciyou as attorney for [K.C.].

18. At no time was notice given to the Hancock County Circuit Court that a paternity action had been filed and was pending in the Fayette Circuit Court at the time the Petition for Paternity and Agreed Entry thereon was filed.

19. At no time did [C.C.], [K.C.] or Ciyou notify [B.H.] said Petition and Agreed Entry had been tendered to the Hancock Circuit Court.

20. On October 22, 2008, the Fayette Circuit Court dismissed [B.H.]'s petition subject to [B.H.] being given ten (10) days to file an amended petition.

## CONCLUSIONS OF LAW

6

21. The Court concludes that the paternity affidavit filed July 30, 2008 is void as a matter of law as [K.C.] knew there was a reasonable possibility that [B.H.] was the actual father of the child. I.C. 31-14-2-1 cannot be used as a fraudulent vehicle to terminate the parental rights of a biological father.

22. The Court concludes that [K.C.] engaged in an unconscionable plan or scheme to defraud *Pinter v. Pinter*, 641 N.E.2d 101, 104 [sic].

\* \* \* \* \*

[K.C.]'s actions in this matter constitute a fraud upon this Court. In Pinter v. Pinter, 641 N.E.2d 101 (Ind. Ct. App. 1994), the Court noted that fraud on the Court is a deliberately planned carefully executed scheme to defraud[]. … Attorney Ciyou had the responsibility if not duty as an officer of the court to notify the Court of the pending action in another Court and failed to do so. Attorney Ciyou carefully executed the filing of the case in Hancock County on the day before a hearing was scheduled in the Fayette County Circuit Court in what can only be concluded was a deliberate plan to deceive the Hancock County Circuit Court. Put simply, [K.C.] committed a fraud upon the Court. Attorney Ciyou, as [K.C.]'s attorney, had an ethical obligation to advise the Court of the pendency of the Fayette County matter. Said conduct in [sic] an egregious example of overzealous representation to the detriment of an attorney's position as an officer of the Court.

**ORDER**

The judgment entered by the court under the cause number 30C01-0810-JP—156 is now determined to be void. A fraud was perpetrated on this court in obtaining that judgment and this court was without jurisdiction when this court entered the judgment as it related to the paternity of the minor child, S.C.

*Id.* at 9-13.

Mother contends the trial court erred in granting B.H.'s Verified Petition for Relief from Judgment for Fraud Upon the Court. Although not so denominated, B.H.'s motion was clearly premised upon Indiana Trial Rule 60(B). That provision states, in relevant part: "On

7

motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment, including a judgment by default, for the following reasons: … fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party[.]" T.R. 60(B)(3). Our Supreme Court has determined that regardless of which procedural vehicle a party uses to assert a claim of fraud on the court, "the party must establish that an unconscionable plan or scheme was used to improperly influence the court's decision and that such acts prevented the losing party from fully and fairly presenting its case or defense." *Stonger v. Sorrell*, 776 N.E.2d 353, 357 (Ind. 2002). "Fraud on the court has been narrowly applied and is limited to the most egregious of circumstances involving the courts." *Id.* The party seeking to have a judgment set aside bears the burden of proving fraud on the trial court. *See Kelley v. Med-1 Solutions, LLC*, 952 N.E.2d 817 (Ind. Ct. App. 2011). "To prove fraud on the court, it is not enough to show a possibility that the trial court was misled." *Stonger v. Sorrell*, 776 N.E.2d at 357. "Rather, there must be a showing that the trial court's decision was actually influenced." *Id.* Our standard of review in such cases is well settled:

> The decision of whether to grant or deny a Trial Rule 60(B) motion for relief from judgment is within the sound, equitable discretion of the trial court. We will not reverse a denial of a motion for relief from judgment in the absence of an abuse of discretion. Moreover, where as here, the trial court enters special findings and conclusions pursuant to Indiana Trial Rule 52(A), our standard of review is two-tiered. First, we determine whether the evidence supports the findings, and second whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. Rather we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them.

8

*Id.* at 358 (internal citations omitted).

Before addressing the merits of Mother's claim, we note that B.H. did not file an appellee's brief. When an appellee fails to submit a brief, we apply a less stringent standard of review with respect to the showing necessary to establish reversible error. *Zoller v. Zoller,* 858 N.E.2d 124 (Ind. Ct. App. 2006). In such cases, we may reverse if the appellant establishes prima facie error, which is an error at first sight, on first appearance, or on the face of it. *Id.* Moreover, we will not undertake the burden of developing legal arguments on the appellee's behalf. *Id.*

In attacking the trial court's ruling, Mother essentially contends that B.H.'s claim of paternity was never pursued correctly and that C.C.'s paternity was conclusively established by the paternity affidavit executed by C.C. and Mother in the hospital shortly after S.C.'s birth. Therefore, the argument goes, B.H.'s rights were not affected by the Hancock County proceeding from which the October 22, 2008 order emanated and B.H. cannot satisfy the T.R. 60(B) requirement that the challenged order "prevented the losing party from fully and fairly presenting its case or defense." *See Stonger v. Sorrell*, 776 N.E.2d at 357. Going to the heart of it, Mother contends that the trial court erred in concluding that the Hancock County proceeding implicated B.H.'s paternity rights and that he could seek to challenge it on that basis, or any basis for that matter.

We note that Mother is represented upon appeal by the same counsel that represented her in the Fayette County proceeding and the Hancock County proceeding. Perhaps not surprisingly, therefore, Mother's argument is concentrated primarily upon the issues of how

paternity is legally established under Indiana law, who may do so, and whether B.H.'s legal efforts to establish his paternity of S.C. were sufficiently valid to confer upon him status to litigate the question of S.C.'s paternity in the realm of what counsel consistently refers to as "the Hancock County filings." *See*, *e.g.*, *Appellant's Brief* at 9. Counsel concludes they are not, and therefore that the trial court erred in granting his petition. Although we are aware that S.C.'s paternity is the underlying issue in this case, we conclude that the correctness of the trial court's ruling does not hinge upon the questions of whether B.H. is, in fact, the biological father of S.C. and whether his legal endeavors to this point comport with statutory guidelines. Rather, we conclude that this case implicates the power of the trial court to vacate an order that it later concludes was issued under a fraudulent pretext.

As set out above, the paternity of S.C. was hotly disputed from the day of her birth. B.H. and C.C. each entertained what appears to be a reasonable belief, based upon having sexual relations with K.C. during the relevant time period, that he was the baby's father. To that end, on July 29, 2008, the day after S.C. was born, B.H. filed a Verified Petition for Immediate Paternity Order in the Fayette Circuit Court, seeking thereby to establish that *he* was S.C.'s biological father. In conjunction with that petition, B.H. sought and received an order compelling K.C. and S.C. to submit to DNA testing before they left the hospital. The day that order was served upon K.C., i.e., July 30, 2008, C.C. and K.C. executed an affidavit of paternity identifying C.C. as S.C.'s biological father. The DNA test was performed on July 31, 2008, and the record contains a DNA Test Report form completed by an entity identified in the record as the DNA Diagnostics Center (the DDC), dated August 4, 2008.

The DDC report form indicates there is a 99.9997% likelihood that B.H. was S.C.'s biological father.[2]

Attorney Ciyou entered his appearance on behalf of K.C. in the Fayette County proceeding on August 15, 2008. Also on that day, Attorney Ciyou filed a verified answer on K.C.'s behalf, as well as a Motion To Dismiss For Lack of Subject-Matter Jurisdiction; Failure to State a Claim Upon Which Relief May Be Granted, and Incorrect Venue. On August 26, the Fayette Circuit Court set Mother's motion to dismiss for a hearing on October 22, 2008. The day before that hearing was to occur, C.C., with Mother's apparent cooperation, filed in Hancock County a Verified Petition to Establish Paternity. Mother's cooperation is apparent by virtue of the fact that, contemporaneously with the Verified Petition to Establish Paternity, Mother and C.C. filed a Verified Joint Stipulation Establishing Paternity and Agreed Entry. Mother and C.C. signed the joint stipulation in their own capacity, and Attorney Ciyou signed in his representative capacity on Mother's behalf. The joint stipulation provided, in relevant part, as follows:

1. That the Parties stipulate and agree that [Mother], is the natural mother of [S.C.], the Child conceived out-of-wedlock, on or about the 15th day of November 2007, and born out-of-wedlock on the 28th day of July, 2008, at Henry County Memorial Hospital, in the County of Henry, State of Indiana.

2. That at the time of conception of said Child, Mother and Father were

---

[2] We note and understand Mother's arguments regarding the admissibility of the DNA test in question. In a nutshell, she contends that the results were not technically admissible either in the Fayette County proceeding or in the instant case. This would be a relevant consideration if this case focused on the substantive issue of the S.C.'s paternity, but it does not. Whether or not the DNA report is or was deemed to be technically admissible in a subsequent legal proceeding, the fact remains that Mother was aware, before she submitted the October 21 Agreed Entry in the Hancock County proceeding, that the DNA test had been performed and the results indicated an overwhelming probability that B.H. was the biological father.

unmarried.

\* \* \* \* \*

3. That the Parties stipulate and agree that Petitioner, [C.C.], is the biological and natural father of [S.C.], and hereby admit and stipulate to paternity thereof.

4. That Petitioner, [C.C.], is a Caucasian American male currently residing at \*\*\*; and that he was born … in Indiana.

5. That Respondent, [Mother], is a Caucasian American female currently residing at \*\*\*; and that she was born … in Indiana.

*Appellant's Appendix* at 40-41. The remainder of the joint stipulation sets out the parties' agreement on matters of custody, support, and visitation. The Hancock County CCS indicates that the court granted the Verified Petition to Establish Paternity on the next day, October 22, 2008. Also on that day, the Fayette Circuit Court conducted the hearing on Mother's motion to dismiss. The court granted the motion and dismissed B.H.'s petition to establish paternity, "subject to [B.H.] filing [an] Amended Petition within 10 days." *Id*. at 33.

The next relevant activity in the case appears to have occurred on June 25, 2010, when B.H. filed his Verified Petition for Relief of Judgment for Fraud Upon the Court, which ultimately was granted following a hearing. The granting of relief was premised primarily upon the basis of fraud upon the court, which in turn was premised upon attorney Ciyou's failure to apprise the Hancock County court of the then-pending Fayette County paternity proceeding. At that point in the Fayette County proceeding, the trial court had yet to rule upon Mother's motion to dismiss.

12

Mother vigorously contends that there is no record of her having perpetrated a fraud upon the Hancock County court because the determination of S.C.'s paternity was a fait accompli by virtue of the paternity affidavit executed in the hospital by Mother and C.C. Mother continues that B.H.'s right to establish paternity was unaffected by the Hancock County action. According to Mother, that proceeding "could do nothing to change, by limitation or expansion, [B.H.]'s legal rights to seek paternity.' *Appellant's Brief* at 9. Indeed, Mother goes so far as to state that the "filing in Hancock County did not seek to establish paternity." *Id*. According to Mother, this is so because "it was established by operation of law on July 30, 2008, when the Hospital Paternity Affidavit was executed." *Id*.

In the final analysis, we conclude that Mother's arguments concerning the legal validity of B.H.'s claim of paternity and the status and viability of his legal endeavors to that end are beside the point. The dispositive question is this: Did Mother procure the Hancock County order by committing a fraud upon the court within the meaning of T.R. 60(B) in failing to inform the Hancock County court about the Fayette County proceeding? As Mother aptly notes, in order to prevail on his motion, it was incumbent upon B.H. to establish that Mother had engaged in an unconscionable plan or scheme in order to improperly influence the court's decision with respect to C.C.'s Verified Petition to Establish Paternity and that such prevented B.H. from fully and fairly presenting his case or defense. *See Stonger v. Sorrell*, 776 N.E.2d 353.

The "plan" that B.H. alleged in support of his motion is readily apparent. The Fayette County paternity action filed by B.H., however flawed, was set for hearing on October 22.

13

The day before that hearing, and a mere five days after a copy of the results of the DNA test were mailed to Mother, C.C. and Mother collaborated in the filing of a paternity action in Hancock County. Mother contends upon appeal that the latter action was not in the nature of an action to establish paternity, but instead was intended merely to settle matters of support and visitation. These protestations notwithstanding, the pleading instituting the action was denominated a "Verified Petition to Establish Paternity", and it was accompanied by a Verified Joint Stipulation Establishing Paternity and Agreed Entry. *Appellant's Appendix* at 36. This clearly conveys that establishing C.C. as the legal father of S.C. was a primary, if not *the* primary, purpose of the action. Indeed, we note that the second of five specified requests for relief in the petition was that "[t]he Court find the Petitioner, [C.C.], to be the father of [S.C.]." *Id*. at 38. Accordingly, the conclusion that the Hancock County proceeding was initiated at least in part to obtain an order legally establishing C.C. as S.C.'s biological father strikes us as eminently reasonable.

The second part of the alleged plan concerned the timing of the filing of the Hancock County action. As noted previously, the verified petition was filed the day before the scheduled hearing in the Fayette County proceeding. Mother would have us believe that the timing of the filing of the Hancock County proceeding vis-à-vis the Fayette County proceeding was purely coincidental, if not serendipitous. We do not utterly reject the possibility that this is so, but the trial court's conclusion that the latter influenced the former is not unreasonable, and is in fact entirely reasonable. Especially in view of the parties' failure to apprise the Hancock County court of the pending Fayette County proceeding, the

14

filing of the verified petition the day before the scheduled hearing in the Fayette County proceeding was unconscionable. Moreover, it was reasonable to conclude that the timing of the filing of the Hancock County action and the failure to inform the court of the existence of the Fayette County proceeding were motivated by a desire to influence the Hancock County court in C.C. and Mother's favor, as there appeared to be no reason for the Hancock County court to inquire further into the matter of S.C.'s biological paternity.

As for the question of influencing the court, the Hancock County court would be in the best position to determine whether the plan in question influenced its decision to issue the ruling from which B.H. sought relief. Based upon the language of the order granting relief from judgment, it appears that the Hancock County court was strongly of the view that its granting of the verified petition was significantly influenced by its lack of awareness of the Fayette County proceeding. We are hard-pressed to second-guess that conclusion. Therefore, we conclude that the Hancock County court did not err in finding the existence of an unconscionable plan intended to influence its decision, which did in fact influence the decision.

The final element necessary to establish grounds for granting relief from judgment under T.R. 60(B) is that the unconscionable plan described above prevented B.H. from fully and fairly presenting his case or defense. *See Stonger v. Sorrell*, 776 N.E.2d 353. Again, we understand Mother's argument that B.H. "still had time to assert a paternity claim" and thus that "the Hancock County filing did not harm or impair any right [B.H.] might have." *Appellant's Brief* at 34. This, however, miscasts the nature of the "prevention of a full and

15

fair presentation of his case" that is required to set aside a judgment under T.R. 60(B) for fraud on the court. It cannot be interpreted such that it applies only to those judgments that lie completely beyond the bounds of direct or collateral attack via appeal or by other means. In fact, this court has illuminated the meaning of this element in a case involving the establishment of paternity.

In *In re Paternity of Tompkins*, 518 N.E.2d 500 (Ind. Ct. App. 1988), a woman had a child at a time when she was separated from her husband. After the couple was divorced a short time later, the woman and her child resided for a year with a man (the prior husband) to whom she had previously been married. After that, she and the child moved in with a third man, whom she subsequently married. Sometime thereafter, the woman and the prior husband executed a paternity affidavit identifying him as the biological father of her child and a judgment of paternity was entered thereon. The woman died suddenly when the baby was approximately three years old and a guardian appointed for her child obtained evidence indicating that the prior husband was not, in fact, the child's biological father. The guardian filed suit to set aside the paternity judgment in favor of the prior husband. The trial court denied the motion and the guardian appealed. Noting that "the facts suggest that [the prior husband] and [the mother] knew that [the prior husband] was not the biological father of" the child, this court reversed and set aside the paternity affidavit on grounds of fraud on the court. *Id*. at 506. We reasoned:

> According to the pleadings [the prior husband] misled the court as to the paternity of [the child]. Furthermore, [the prior husband's] action appeared to have been planned in an attempt to prevent [the child] from determining his true biological father. The scheme to suppress true paternity succeeded when

16

the court declared [the prior husband] as [the child's] biological father. As in *Hazel–Atlas* and *Toscano,* [the child] was prevented from having an actual day in court, and the court was defrauded by use of the fabricated petition.

*Id.* at 507.

In the instant case, Mother admitted that at the time she and C.C. executed the paternity affidavit, she was aware there was a possibility that C.C. was not S.C.'s father, and that B.H. was. The questions raised on appeal as to the technical admissibility of the DNA test or the efficacy of the legal steps undertaken by B.H. to assert his claim of paternity do not implicate the state of Mother's knowledge as to the true identity of S.C.'s biological father at the time she and C.C. executed the paternity affidavit. In short, there is evidence that Mother had cause to doubt C.C.'s paternity of S.C. when she executed the paternity affidavit attesting under oath to the fact that C.C. was the biological father. She repeated that sworn attestation in her October 22, 2008 Verified Joint Petition Establishing Paternity and Agreed Entry. As set out above, the execution of the paternity affidavit, combined with the timing of the filing of the Hancock County proceeding, appear to have been part of a plan or scheme to suppress the true identity of S.C.'s biological father, which resulted in the issuance of a paternity order by the Hancock Circuit Court that prevented B.H. from "having an actual day in court[.]" *See id.*

As a final matter, we address the argument advanced by Mother and adopted by our colleague in dissent in support of the case for reversal, i.e., that our affirmance of the trial court's order is against public policy. According to the dissent, the trial court's order renders S.C. "a *fillius nullius*, a 'child of no one.'" Slip op. at 30. The dissent posits that such status

carries with it "'countless detrimental emotional and financial effects.'" *Id.* (quoting *In re Paternity of E.M.L.G.*, 863 N.E.2d 867, 870 (Ind. Ct. App. 2007)). Finally, as a result of a perfect storm of predictable consequences, the dissent projects a grim future for Mother and S.C. that is devoid of financial support and other involvement on the part of either C.C. or B.H. This includes the possible abandonment of S.C. by C.C. ("[a]ll that has occurred here is the judicially imposed removal of [C.C.'s obligation to pay support] since B.H. has not been legally recognized as S.C.'s father", slip op. at 30), B.H. abandoning his paternity claim, and Mother's predictable reluctance to pursue B.H. ("[t]]hat Mother would be reluctant to pursue such course seems obvious given her attempts to flee from B.H. in the past", id. at 30-31). These hardly seem likely.

As to the first (i.e., that C.C. will abandon S.C. and Mother), we note that C.C. was aware from the day S.C. was born of the possibility that B.H. was the child's biological father. It appears from the record that C.C. nevertheless has supported S.C. and Mother as if S.C. was his daughter. Clearly, with respect to C.C.'s motivations concerning S.C. and her welfare, there is more at work than mere legal obligation. If the photos and testimony concerning C.C.'s relationship to the child are any indication, he is fond of S.C. and is impelled much more by those feelings than by the coercive force of legal obligation. As to the prospect of B.H. abandoning his claim of paternity, we see nothing in the record that renders it likely, much less more likely than not. The likelihood that Mother will not pursue a support order against B.H. (which assumes both that B.H. will be proven to be the biological father *and* that he will not undertake the obligation voluntarily) is similarly

18

speculative and, we think, without support in the record. In short, we are not persuaded that these possibilities are inevitable consequences of this decision.

Moreover, we believe public policy considerations actually counsel *in favor* of our decision. In a case similar in some relevant respects to the instant case, our Supreme Court stated:

> We appreciate the Court of Appeals' concern for a man who may be deprived of parental rights that he assumed for many years and wishes to retain even though he is not the child's biological father. *However, a countering important policy concern is identifying correctly parents and their offspring. "Proper identification of parents and child should prove to be in the best interests of the child for medical or psychological reasons. It also plays a role in the just determination of child support; we have already declared that public policy disfavors a support order against a man who is not the child's father." In re S.R.I.,* 602 N.E.2d 1014, 1016 (Ind. 1992). In the end, such policy choices are the province of the legislature. Also, a husband who is not the biological father of his wife's child may pursue legally adopting the child, bringing such child within the statutory definition of "child."

*Russell v. Russell*, 682 N.E.2d 513, 517 n.7 (Ind. 1997) (emphasis supplied); *see also In re Paternity of S.R.I.*, 602 N.E.2d 1014 (Ind. 1992). Put plainly, there is considerable value in correctly identifying S.C.'s biological father. We reiterate that this decision does not leave S.C. without a father and Mother without options. Even assuming that the July 31, 2008 DNA test was faulty or legally inadmissible, the parties are free to have another test performed and do what they will depending upon those results, including the pursuit of support proceedings against B.H. or the initiation of adoption proceedings by C.C.

Be that as it may, Mother has failed to establish prima facie error in the Hancock Circuit Court's order to set aside its October 22, 2008 paternity order and therefore the judgment is affirmed.

19

Judgment affirmed.

MATHIAS, J., concurs.

RILEY, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE MATTER OF THE PATERNITY OF S.C.: | ) ) ) | |
| K.C., | ) ) | |
| Appellant-Respondent, | ) ) | |
| AND | ) ) | No. 30A01-1107-JP-322 |
| C.C., | ) ) | |
| Appellee-Petitioner, | ) ) | |
| AND | ) ) | |
| B.H., | ) ) | |
| Appellee-Intervenor. | ) | |

**RILEY, Judge, dissenting**

I respectfully dissent from the majority's decision to affirm the trial court's grant of relief from judgment. I would reverse the trial court's October 28, 2010 Order as contrary to Indiana law establishing paternity.

The majority makes it clear that their holding is premised upon "the power of the trial court to vacate an order that it later concludes was issued under a fraudulent pretext." Slip

op. p. 10. The trial court here concluded that the paternity affidavit was void as a matter of law because it "cannot be used as a fraudulent vehicle to terminate the parental rights of a biological father." (Appellant's App. p. 11). The trial court further concluded that Mother and her counsel's actions in procuring the October 22, 2008 Order constituted fraud on the court. However, because the paternity affidavit at issue was not properly rescinded and because B.H. was not deprived from fully and fairly establishing his paternity of S.C. by virtue of either the paternity affidavit or the October 22, 2008 Order, I conclude that both of the trial court's conclusions are clearly erroneous.

## I. *Paternity Affidavit*

Paternity may only be established though a paternity action commenced under I.C. ch. 31-14 or by execution of a paternity affidavit under I.C. § 16-37-2-2.1. *See* I.C. § 31-14-2-1; *In re Paternity of D.L.*, 938 N.E.2d 1221, 1225 (Ind. Ct. App. 2010), *aff'd on reh'g*, 943 N.E.2d 1284. An "executed paternity affidavit conclusively establishes the man as the legal father of a child without any further proceedings by a court." I.C. § 16-37-2-2.1(n); I.C. § 31-14-7-3.

Statutory and case law provide two ways that a paternity affidavit may be rescinded. First, I.C. § 16-37-2-2.1 (i) allows the man who executed a paternity affidavit to file an action requesting a genetic test within sixty days following execution of the paternity affidavit. If the genetic test reveals that the man who signed the paternity affidavit is not the biological father, then the court may set aside the paternity affidavit. I.C. § 16-37-2-2.1(l). If more than sixty days have passed, the court may set aside the paternity affidavit only if there is (1) a

showing of "fraud, duress, or material mistake of fact existed in the execution of the paternity affidavit" and (2) a court-ordered genetic test requested by the man *who signed the paternity affidavit* reveals him not to be the biological father. I.C. § 16-37-2-2.1(j). Second, although the Indiana Code does not provide for a direct action to disestablish paternity, establishing paternity in another man in effect operates to disestablish paternity, even if paternity is established through a paternity affidavit. *In re Paternity of M.M.*, 889 N.E.2d 846, 848 (Ind. Ct. App. 2008), *reh'g denied*.

Here, C.C. did not bring an action to contest his paternity of S.C., nor did the trial court order a genetic test. The trial court was therefore not permitted to rescind the paternity affidavit under I.C. § 16-37-2-2.1(i) or (j). *See* I.C. §16-37-2-2.1(l). Further, paternity had not yet been established in B.H. through a genetic test under a separate action, and thus there was no action to disestablish C.C.'s paternity. Although a mother who falsely names a man as biological father in a paternity affidavit commits a Class A misdemeanor, the statute does not address rescission of a paternity affidavit under such circumstances. *See* I.C. §16-37-2-2.1(g). Consequently, I conclude that the trial court erroneously voided the paternity affidavit in light of the statute and relevant case law.

Furthermore, the trial court's conclusion that B.H.'s rights as biological father are terminated by a fraudulent paternity affidavit is not supported by Indiana law governing the establishment of paternity. After paternity has been established in one man through a paternity affidavit, another man alleging to be a child's father may assert his paternity in three ways. The first is through a direct action, which in general must be commenced within

23

two years following the birth of the child. I.C. § 31-14-5-3(b). A man alleging paternity may also bring an indirect action as the child's next friend. I.C. § 31-14-5-2. Such action must generally be brought before the child's eighteenth birthday. I.C. § 31-14-5-2(b); *In re Paternity of K.L.O.*, 816 N.E.2d 906, 908 (Ind. Ct. App. 2004). Finally, if requested by an alleged father, a county prosecutor must bring a paternity action under I.C. § 31-14-4-2. *Clark v. Kenley*, 646 N.E.2d 76, 78 (Ind. Ct. App. 1995), *trans. denied*. Such action is not time barred even if the two-year statute of limitations applicable to a direct action to establish paternity has expired. *In re Paternity of N.D.J.*, 765 N.E.2d 682, 683-84 (Ind. Ct. App. 2002).

C.C. and Mother executed the paternity affidavit on July 28, 2008. From that point forward, no further court proceedings were required to establish C.C.'s paternity. I.C. § 16-37-2-2.1(n). Although the trial court found the paternity affidavit void based on Mother's knowledge that there was a reasonable possibility that B.H. was S.C.'s biological father, the paternity affidavit did not preclude B.H. from asserting paternity in his own right. Consequently, the trial court's conclusion that the paternity affidavit, even if fraudulent, amounted to a termination of a biological father's rights is clearly erroneous, and the trial court abused its discretion in declaring the paternity affidavit void as a matter of law.

## II. *Fraud upon the Court*

As the majority points out, "[f]raud upon the court is narrowly applied and is limited to the most egregious of circumstances involving the courts." *Stonger*, 776 N.E.2d at 357. Fraud upon the court may be pursued through three ways under T.R. 60(B): (1) a T.R.

60(B)(3) motion for extrinsic or intrinsic fraud, brought within one year of the judgment; (2) an independent action for extrinsic fraud under T.R. 60(B)(8); and (3) an independent action to invoke the court's inherent power to grant relief for fraud on the court. *Id*. at 355-57. No matter which of the three avenues is invoked, fraud upon the court requires a showing that (1) the adverse party engaged in an "unconscionable plan or scheme" that improperly influenced the trial court's decision and (2) that the moving party was deprived from "fully and fairly presenting his case." *Id*. at 357.

The trial court concluded that the October 22, 2008 Order was obtained through a deliberately planned, carefully executed scheme to defraud the court. However, as noted above, fraud upon the court requires not only a showing of a deliberate scheme, but also that the moving party be precluded from fairly and fully presenting his case. *Id*. Since the October 22, 2008 Order did not establish C.C.'s paternity, nor prevent B.H. from asserting paternity in his own right, the trial court's conclusion that Mother committed fraud upon the court is clearly erroneous.

As discussed above, the trial court's October 22, 2008 Order did not establish C.C.'s paternity of S.C. by way of a paternity action under I.C. ch. 31-14; rather, C.C.'s paternity was established through the paternity affidavit. I.C. § 16-37-2-2.1(n); I.C. § 31-14-7-3. Although the October 22, 2008 Order adopted C.C. and Mother's joint stipulation of C.C.'s paternity derived from the paternity affidavit, more importantly, the Order was prefaced upon the parties' arrangements as to S.C.'s custody, support, and parenting time. A trial court may find without a hearing that a man is a child's biological father based upon a joint stipulation

and where such determination has already been made, the court must conduct a hearing to determine "support, custody, and parenting time" issues. I.C. § 31-14-8-1; -10-1. If the parties file a verified written stipulation resolving the foregoing issues or a joint petition to establish paternity, the court is not required to hold a hearing, and incorporates the provisions of the stipulation into its orders thereon. I.C. § 31-14-10-3.

Here, C.C. filed a Verified Petition to Establish Paternity with the Hancock County Court on October 21, 2008. Although its caption purported to establish paternity, C.C.'s Verified Petition to Establish Paternity merely sought acknowledgement of his paternity derived from the paternity affidavit. In addition, the trial court was requested to grant Mother sole physical and legal custody and make arrangements for parenting and support. Thus, C.C.'s paternity was established by the paternity affidavit, not by the trial court's October 22, 2008 Order, which is properly viewed as merely a modification of those custodial and other arrangements specified in the paternity affidavit. *See* I.C. § 16-37-2-2.1(f).

Also as discussed above, at the time of the October 22, 2008 Order, B.H. could still assert his paternity through a direct action, indirect action as S.C.'s next friend, or upon request to the prosecutor. Consequently, no matter if Mother and her counsel engaged in a deliberate scheme to defraud the trial court, B.H. was not precluded from "fully and fairly" presenting a defense, and thus the trial court abused its discretion in granting B.H.'s motion for relief from judgment.

26

III. *Prior Precedent*

The majority relies on *In re Paternity of Tompkins*, 518 N.E.2d 500 (Ind. Ct. App. 1988), to support its premise that the "prevention of a full and fair presentation of his case" component of fraud upon the court "cannot be interpreted such that it applies only to those judgments that lie completely beyond the bounds of direct or collateral attack via appeal or other means." Slip op. p. 16. Although involving both a paternity matter and determination of fraud upon the court, *Tompkins* is distinguishable on a number of grounds so as to render it incapable of guidance here.

First, contrary to the majority's summary of *Tompkin*'s facts, no hospital paternity affidavit was apparently involved in that case. *Tompkins* instead involved a joint petition to establish paternity and mention of a "paternity affidavit" appears nowhere in the opinion.[3] Legislation providing for the hospital paternity affidavit at issue in this case was not enacted until 1989, while *Tompkins* was decided in 1988.[4] Thus, the *Tompkins* court set aside a petition establishing paternity rather than a hospital paternity affidavit doing so. Here, the majority implicitly analogizes C.C.'s Verified Petition to Establish Paternity to the *Tompkins* joint petition by asserting that C.C.'s petition, filed *pro se*, "was initiated at least in part to

---

[3] This is not to say that affidavits acknowledging paternity did not exist. *See Johnson v. Ross*, 405 N.E.2d 569, 572 (Ind. Ct. App. 1980) (paternity deemed admitted by father's execution of an "Affidavit of Legitimation" filed with a county board of health).

[4] *See* I.C. §§ 16-1-16-15 and 31-6-6.1-9 (1989), both amended by P.L. 185-1989, §§ 6 & 9, effective July 1, 1989, to provide for paternity affidavits. Both sections were repealed and either recodified or reconstituted as I.C. §§ 16-37-2-2.1 and 31-14-7-1, respectively, by P.L. 46-1995, § 63 and P.L. 1-1997, § 157, effective July 1, 1997. Further, I.C. § 31-14-7-3, conclusively establishing the man signing the paternity affidavit as the legal father, was enacted by P.L. § 138-2001, § 8, effective July 1, 2001.

27

obtain an order legally establishing C.C. as S.C.'s biological father." Slip op. p. 14. Despite acknowledging that C.C.'s recitation of paternity derived through the paternity affidavit was only one of the five requests for relief contained in C.C.'s petition, the majority points to this recitation to justify its determination that Mother and her attorney used the trial court to fraudulently procure an order establishing C.C.'s paternity. The majority has elevated form over substance since, as noted above, all that Indiana law requires in such case is that the trial court, without a hearing, approve the parties' arrangements as to support, custody, and parenting time. *See* I.C. § 31-14-10-3.

Second, the *Tompkins* court found that by fraudulently filing a petition for paternity, the child "was prevented from having an actual day in court, and the court was defrauded by use of the fabricated petition." *Id*. at 507. As explained previously, however, no one has been denied their day in court. Although the time for him to file a direct action may have expired, B.H. may yet establish paternity as S.C.'s next friend or upon request to the county prosecutor, which, in the latter case, may also be requested by the child, the mother, and any other party designated under I.C. § 31-14-4-2. *See In re the Paternity of B.N.C.*, 822 N.E.2d 616, 620 n.7 (Ind. Ct. App. 2005) (distinguishing *Tompkins*).

Third, the equities involved in *Tompkins* actually favor upholding C.C. as the legal father of S.C. *Tompkins* involved a mother who gave birth to a son while separated from her second husband. *Id*. at 502. The mother moved in with her first husband, divorced her second husband, then met and married her third husband. *Id*. Following her marriage to the third husband, Mother and her first husband "filed a joint petition to establish paternity" and

28

"a judgment was entered declaring" the mother's first husband as the child's father. *Id.* Both the mother and the first husband knew that the first husband was not the child's biological father. *Id.* at 506. Mother remained married to her third husband until her death when the child was five years old. *Id.* at 502. The third husband initiated guardianship proceedings for the child and the child's guardian sought "to set aside the paternity judgment on the basis of fraud" after determining that mother's first husband was not the child's biological father. *Id.* The court noted that the child's interests and his "need for stability and psychological support would be served best if he were allowed to remain with his half-sister and [the mother's third husband], rather than his father as presumed under the paternity judgment." *Id.* at 503.

The equities here favor the opposite result. Mother and C.C. both knew B.H. and purchased drugs from him. In 2007, Mother was at B.H.'s house when she learned she was pregnant. By this time, Mother was addicted to methadone, which B.H. had provided to her. Mother ceased contact with B.H. and began taking Suboxone to control her addiction to opiates. Since S.C.'s birth, C.C. has been the only father she has known. It is thus arguable that both Mother and S.C.'s interests would be better served without B.H.'s involvement.

Finally, the result in *Tompkins* is not consistent with this court's subsequent resolutions of those paternity affidavits obtained expressly or impliedly by fraud. A paternity affidavit knowingly executed falsely by both the mother and father has been upheld against the mother's subsequent attack. *In re H.H.*, 879 N.E.2d 1175, 1176, 1178 (Ind. Ct. App. 2008). A paternity affidavit was set aside only upon establishing the identity of the

biological father pursuant to I.C. § 31-14-4-1. *Paternity of Davis v. Trensey*, 862 N.E.2d 308, 314 (Ind. Ct. App. 2007); *see also Paternity of H.J.B. ex rel. Sutton v. Boes*, 829 N.E.2d 157, 160 (Ind. Ct. App. 2005) ("We likewise think that it would be appropriate for the trial court to withhold the disestablishment of a deceased father's paternity until paternity has been established in another man."). Paternity affidavits have also been upheld in the face of medical evidence to the contrary. *See In re K.M.*, 651 N.E.2d 271, 274-276 (Ind. Ct. App. 1995).

IV. *Public Policy*

The soundness of the majority's conclusion is further belied by examination of the effect of its decision. S.C. has now been rendered a *filius nullius*, a "child of no one" – a situation carrying with it "countless detrimental emotional and financial effects." *In re Paternity of E.M.L.G.*, 863 N.E.2d 867, 870 (Ind. Ct. App. 2007) (citation omitted). No matter if S.C.'s biological father is in fact B.H., C.C. undertook the obligation to support S.C. and B.H. has not. All that has occurred here is the judicially imposed removal of that obligation since B.H. has not been legally recognized as S.C.'s father. This leads to an unjust result whereby B.H. is free to abandon his claim to S.C.'s paternity leaving S.C. with no one obliged to support her. Given B.H.'s dilatory attempts to establish his paternity of S.C. following his initial attempt to secure a DNA test, it is plausible that he may refrain from further proceedings. Although S.C., Mother, or the State may file an action to compel B.H. to submit to DNA testing in accordance with Indiana paternity law, it is improper to deny S.C. support in the interim. That Mother would be reluctant to pursue such course seems

30

obvious given her attempts to flee from B.H. in the past.  Accordingly, I would reverse the trial court.