

I N   T H E

# Court of Appeals of Indiana

In the Matter of the Guardianship of C.B.,

Savannah Huff,

Appellant-*Respondent*

v.

Lavon Case,

*Appellee-Petitioner*



FILED

May 15 2025, 8:58 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

---

May 15, 2025

Court of Appeals Case No.
24A-GU-1997

Appeal from the Spencer Circuit Court

The Honorable Jon A. Dartt, Judge

Trial Court Cause No. 74C01-2312-GU-45

---

**Opinion by Judge Foley**
Judges Bailey and Bradford concur.

**Foley, Judge.**

[1] Savannah Huff ("Mother") appeals from the trial court's order awarding permanent guardianship of her child, C.B. ("Child"), to Lavon Case ("Case"), Child's paternal great-grandmother. Finding that Case failed to rebut the presumption in favor of a natural parent by clear and convincing evidence, we reverse and remand for further proceedings to structure a transition of custody.

## Facts and Procedural History

[2] Child was born in 2018 to Mother and Father, who never married. As of December 2023, when Child was five years old, Child's biological father ("Father") was his primary custodian.[1] Child requires special care due to his "severe autism which has rendered him largely non-verbal, in need of structure, [and] resistant to change[.]" Appellant's App. Vol. 2 p. 13. Child has special needs in his educational and physical development, and in addition to being non-verbal, requires the use of pull-up diapers. While Child was in Father's care, Case and Child's paternal grandmother Michelle Stevens ("Grandmother"), regularly helped Father care for Child. Father had his own residence, but Child had a bedroom at Case's home and slept at Case's home every night. When Child started kindergarten in the fall of 2023, each morning Case would wait for the school bus with Child and would typically notify

---

[1] Sometime after Child's birth a paternity case was established under cause number 74C01-1807-JP-188 ("JP-188"), and pursuant to the orders of the paternity court, Father had primary custody and Mother had parenting time.

school personnel that Child had boarded the bus. Child attended David Turnham Elementary School ("Turnham"), where he had an Individualized Education Plan ("IEP"). Child had made "a lot of gains since the beginning of the year." Tr. Vol. 2 p. 9. Whereas Child "didn't sit in a chair" in preschool, Child would now "sit at his desk[,]" where he completed schoolwork and was making progress using a tablet to communicate. *Id.* In these respects, Child was "doing amazing." *Id.*

[3] As of December 2023, Mother had mid-week parenting time on Wednesdays and Thursdays, when she would pick up Child and bring him back to Case's residence at 7:00 p.m. Every other weekend, Child would spend overnights with Mother, then Child was returned to Case's residence. Mother was the primary caregiver for Child's younger half-brother, C.H., who was also diagnosed with autism. Mother was also pregnant with Child's half-sister, W., who was due in the spring of 2024.

[4] On December 22, 2023, Father suddenly passed away. Within a week of Father's death, Case petitioned the trial court for a temporary and permanent guardianship over Child. In response, Mother petitioned to establish legal custody over Child in the paternity case. On December 27, 2023—the day Case filed her petition—the trial court awarded Case temporary guardianship of Child. Later that day, Mother filed a motion to set aside the temporary guardianship. On January 2, 2024, the trial court denied Mother's motion. In mid-February 2024, the trial court issued an order consolidating the paternity

case into the guardianship case, ordering all pleadings, orders and hearings be conducted in the guardianship case, and closing the paternity case.[2]

[5] On May 20, 2024, the trial court held a hearing on Case's petition for permanent guardianship and Mother's petition to establish legal custody. As of the hearing, Child was nearly six years old and still attended Turnham. C.H. was four years old and attended Holland Elementary School ("Holland"), which is located approximately ten miles from Turnham. W. was nearly seven weeks old. Mother was on maternity leave and when she returned to work, Mother planned to place W. in the same daycare as C.H.

[6] While the temporary guardianship was in place, Child's routine remained largely unchanged since Father's passing. Case assisted Child in getting ready for school each morning, made sure his lunchbox was in his backpack and that "[he] [had] a change of clothes in there. [Child had] extra diapers and wipes. [She has] furnished his diapers since he was a little bitty baby and his pull-ups[.]" *Id*. at 48. Child returned from school to Case's residence every day, except for Tuesdays and Thursdays. On those days, Case picked Child up early from school to go to Harvest Rehab for speech and occupational therapy sessions. On days when Child returned to Case's home after school, Grandmother, who moved into Father's residence after his passing, "pick[ed] him up . . . they fix[ed] his supper for him . . . g[a]ve him a bath, brush[ed] his

---

[2] We take judicial notice of the pleadings and orders within the JP-188 cause number. *See generally* Ind. Evidence Rule 201.

teeth, comb[ed] his hair, put his pajamas on him[,] and br[ought] him back to [Case's] house at seven o'clock (7:00) at night." *Id*. at 52. As was the case before Father passed away, Mother exercised her mid-week parenting time on Wednesdays and Thursdays and overnights every other weekend.

[7] Child "had a very difficult time" when Father passed away. *Id*. at 39. As school personnel put it: "He presented as angry at school. That was a big change in his life and a big change in his routine . . . it took quite some time for us to help him you know through that." *Id*. Child had made progress in the intervening months. As of the hearing Child was "not presenting as angry" at school. *Id*. Rather, Child "appear[ed] to be content and happy when he's at school[.]" *Id*.

[8] As of the hearing, Case was eighty-two years old. Case testified about Child's routine and noted that she established services for Child at Harvest Rehab during the school year to ensure he had a place during the summers to continue his speech and occupational therapy. During the hearing, Case raised one concern she had with Mother, stating that Mother "still hangs around with drug—people who do drugs. I don't like that." *Id*. at 66. Otherwise, Case did not express concerns about Mother's ability to care for Child. Similarly, Grandmother did not have concerns about Child's wellbeing with Mother.

[9] Mother testified about her routines with her children, explaining what Child's schedule would look like if he primarily resided with her. Mother intended to have Child attend Holland with his half-brother C.H., who also had an IEP in

place and was receiving speech and occupational therapy services. Mother utilized before and after school care for C.H., dropping him off at the daycare provider's home each morning, where he would take the bus to and from school, and picking him up each evening. Mother highlighted the services C.H. receives at Holland due to his autism diagnosis and that she has met with staff at Holland regarding C.H.'s IEP. Mother testified about her preference to have Child and C.H. attend school together at Holland. Although Mother stated that she thinks "[Turnham] is a great school[,]" she stated that she "think[s] that Holland is also a great school and [she] think[s] that any school that you would go to there's going to be some kind of specialized individual plan for kids with disabilities." *Id*. at 93. Moreover, Mother testified that she had only had one meeting with the staff at Turnham regarding Child's IEP but stated that "in August when he started school, that was the last time for his IEP [meeting] and then from December to March [she] wasn't allowed to have [any contact] with his school." *Id*. at 110. Mother further explained that she takes all the children to the same primary care physician and had taken Child to an urgent care and emergency care facility for an illness he had roughly two months before the hearing. Mother hoped that, in addition to the treatment Child is already receiving, Child and C.H. would be referred to an autism specialist in Indianapolis. Mother wanted to wait until summer break to obtain the referral because she did not "want to remove them from school" and thought it is important that they do not miss school. *Id*. at 95.

[10] Mother testified about Child's relationship to his siblings, noting that Child "pays no attention" to W. *Id*. Mother said that, when Child and C.H were really young, they "kind of struggled with each other." *Id*. at 95–96. In the last year though, Mother observed that "they're a lot closer. They take all their baths together. They love bath time together . . . [they] play with their toys. They sleep in the same room. They share a room together. They play on the trampoline together[.]" *Id*. at 96. Mother testified that after Father passed, Child stayed with Mother for a week before "[Case] wanted to take it back to how [Child's Father] had it." *Id*. One concern that Mother had if Case was granted a permanent guardianship over Child was Case's physical limitations. She expressed concern about the possibility of Child "having a bad day or something and he doesn't want to do something and runs out into the road or stuff like that." *Id*. at 97. As to Case, Mother added: "She can't get down on the floor and play with [Child]. You know, she can't roughhouse with him which is what [Child] loves." *Id*. at 98.

[11] Approximately three years before the evidentiary hearing, Mother was convicted of dealing in methamphetamine as a Level 2 felony. Mother was placed on supervised probation with day reporting and anticipated being on day reporting until 2028. Mother testified that in her nearly three years of community corrections monitoring, she had no violations. Mother also testified to her sobriety, stating that she has been sober since April 2021. She further testified to the treatment she received due to her substance abuse issues noting

she spent a year at LifeSprings and had a year of individual therapy and group therapy.

[12] At the conclusion of the hearing the trial court took the matter under advisement, and on August 5, 2024, the trial court issued its consolidated order appointing Case as Child's permanent guardian and modified the prior custody order to award custody of Child to Case. In its order, the trial court emphasized that "the law is clear that Mother takes priority in terms of guardianship or other relatives as long as she is doing well." Appellant's App. Vol. 2 p. 16. The order stated the trial court was taking an "interim approach that will gradually transition [Child] back to his Mother's care over the next several months." *Id.* The order extended Mother's parenting time to provide that Mother's two midweek visits would be overnight visits and that Mother would have three (3) weekend visits each month. The trial court indicated review hearings would be set in January and July of 2025 and that Mother was expected to provide the court with "evidence [and] documentation of where [Child] w[ould] be going to school, daycare[,] and [Mother's] plan to keep [Father's family] involved in [Child's] life." *Id.* at 18. Ultimately, the trial court anticipated that, in the next year, Child would gradually transition to Mother's care and custody. Mother now appeals.

## Discussion and Decision

[13] Initially, we note that Case did not file an appellee's brief. "When an appellee fails to submit a brief, we apply a less stringent standard of review with respect to the showing necessary to establish reversible error." *In re Paternity of S.C.*,

966 N.E.2d 143, 148 (Ind. Ct. App. 2012), *trans. denied.* "[W]e may reverse if the appellant establishes prima facie error, which is an error at first sight, on first appearance, or on the face of it." *Id.* "Moreover, we will not undertake the burden of developing legal arguments on the appellee's behalf." *Id.* Nevertheless, even under this less stringent standard, "we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required." *Tisdale v. Bolick*, 978 N.E.2d 30, 34 (Ind. Ct. App. 2012).

[14] Indiana Code section 29-3-2-4(a) pertains to guardianship proceedings, providing that "[a]ll findings, orders, or other proceedings under this article shall be in the discretion of the court[.]" "We review the trial court's order in guardianship proceedings for an abuse of discretion, with a preference for granting latitude and deference to our trial judges in family law matters." *In re Guardianship of A.Y.H.*, 139 N.E.3d 1050, 1052 (Ind. Ct. App. 2019) (citing *In re Guardianship of M.N.S.*, 23 N.E.3d 759, 765–66 (Ind. Ct. App. 2014)). "We will find an abuse of discretion only when the decision of the trial court is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law." *In re Guardianship of Hollenga*, 852 N.E.2d 933, 937 (Ind. Ct. App. 2006). "We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment." *Guardianship of S.S.*, 249 N.E.3d 656, 660 (Ind. Ct. App. 2024) (quoting *In re Guardianship of J.K.*, 862 N.E.2d 686, 691 (Ind. Ct. App. 2007)).

Moreover, "[w]here the trial court issues findings of fact and conclusions thereon, we typically employ a two-tiered standard of review, determining first whether the evidence supports the findings and then whether the findings support the judgment." *In re A.Y.H.*, 139 N.E.3d at 1052. "While we review the trial court's conclusions de novo, we will not set aside the findings unless they are clearly erroneous, meaning that our review of the record leaves us firmly convinced that a mistake has been made." *Id.*; *see also* Ind. Trial Rule 52(A) (stating "the court on appeal shall not set aside the findings or judgment unless clearly erroneous").

The trial court found in its written order in relevant part that:

> 12. In the end, the Court has a lot of questions and concerns about [Child's] future schooling, daycare[,] and care if the Court were to just [o]rder custody switched immediately to [M]other and the guardianship terminated. However, the law is clear that Mother takes priority in terms of guardianship or other relatives as long as she is doing well. As a result, the Court chooses an interim approach that will gradually transition [Child] back to his Mother's care over the next several months.

> 13. The Court finds it is in the best interests of [Child] for the temporary guardianship of Petitioner/Great–Grandmother, [Case], to be made into a regular guardianship. The Court now Finds a guardianship is necessary for the person and estate of [Child] and [Case] is a fit and proper person to be awarded said guardianship.

> . . . .

16. [Mother] by law is entitled to the return of her child into her care and custody as long as she continues to progress and do well. The Court now gives the parties the road map on how that is to occur by next school year (2025–2026).

. . . .

18. Mother's parenting time shall increase so that she will have three (3) out of every four (4) weekends each month and her two (2) days of parenting time each week shall become overnight parenting time and she will be responsible for making sure [Child] gets to school the next morning after her weekday parenting time as the school is just a few minutes from Mother's home. The Court understands this Order may mean Mother would have two (2) special needs children in two (2) different schools but the Court is tasked with looking out for [Child's] best interests and specifically finds it is in his best interests to go to [Turnham] this next school year as Mother said just a few months ago was her original intent. Perhaps [Mother] could consider sending both [Child] and [C.H.] to [Turnham] so as to not have to have them enrolled in two (2) different schools.

19. The Court intends to follow the progress in this case the next school year and will set review hearings in January and July of 2025 to help the parties transition [Child] to Mother's care and custody at the end of next summer and prior to the start of the 2025–2026 school year.

. . . .

21. At the July hearing, the Court expects to receive evidence/documentation of where [Child] will be going to school, daycare and [Mother's] plan to keep the [Child's Father's] side of the family involved in [Child's] life. This Order

will require the parties to continue to communicate and cooperate for what is in [Child's] best interests.

Appellant's App. Vol. 2 pp. 16–18.

[17] Our Supreme Court in *In re Guardianship of B.H.* recognized a presumption in favor of a natural parent, rather than the appointment of a third-party guardian:

> [B]efore placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because a third party could provide the better things in life for the child. In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the fault of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required.

770 N.E.2d 283, 287 (Ind. 2002) (citations and quotations omitted).

[18]     Mother has established prima facie error in the trial court's order placing custody with Case and granting a permanent guardianship of Child. Despite characterizing its order as an "interim approach" with a transition of custody to Mother within the next year, the order is a permanent custody order placing custody with a third party over the objection of the natural parent. This requires that the presumption in favor of a natural parent be rebutted by clear and convincing evidence. The evidence and trial court findings fail to support the conclusion that Mother was unfit or that Case had otherwise rebutted the presumption favoring placing custody with Mother by clear and convincing evidence. Mother had the custody and care of her younger two children, including a special needs child with a similar diagnosis as Child, was employed, and sober. Child had bonded with Mother and his siblings. There was no evidence that Mother provided insufficient care for Child or her younger children, that Mother failed to execute her parenting time, or otherwise endangered Child. With respect to Child's schooling, Case failed to present any evidence to demonstrate that Mother's preferred school was insufficient, inadequate, or failed to meet the needs of Child. We acknowledge that the trial court's and Cases's concerns regarding Child's adjustment to a change in custody are well founded, but in and of itself are insufficient to overcome "the important and strong presumption that a child's interests are best served by placement with the natural parent[.]" *In re B.H,* 770 N.E.2d at 287.

[19]     As noted above, the trial court characterized its order as an "interim approach" and included language to transition Child to Mother's care "over the next

several months." Appellant's App. Vol. 2 p. 16. The order provided for review hearings and imposed additional burdens on Mother to attain custody of Child, but nonetheless required modification of the order for Mother to attain custody.[3] We recognize that consideration must be given to the effects that a sudden change of custody may have on a child and that a trial court may implement orders to transition a change of custody over a period of time. However, the trial court's current approach constituted a permanent custody order in favor of Case, rather than a custody order in favor of Mother, that included a transition of custody from Case to Mother over a period of time. We do not view this as simply a matter of semantics, but as material with respect to the legal hurdles Mother must navigate to restore custody.

[20] Mother has established prima facie error in the order awarding Case permanent custody and guardianship over Child. Therefore, we reverse the permanent custody and guardianship order and remand to the trial court for the opportunity to consider any necessary terms for the transition of custody to Mother.

[21] Reversed and remanded.

---

[3] The court "expect[ed] to receive evidence [and] documentation of where [Child] w[ould] be going to school, daycare[,] and [Mother's] plan to keep [Father's family] involved in [Child's] life." Appellant's App. Vol. 2 p. 18.

Bailey, J. and Bradford, J., concur.

ATTORNEY FOR APPELLANT

Andrew W. Foster
The Law Office of Andrew W. Foster, LLC
Rockport, Indiana