In the Matter of the PATERNITY OF H.H., Richard Lucito, Appellant–Petitioner,

v.

Ericka M. Hughes, Appellee–Respondent.

No. 64A03–0709–JV–431.

Court of Appeals of Indiana.

Jan. 31, 2008.

Debra Lynch Dubovich, Levy & Dubovich, Highland, IN, Attorney for Appellant.

Robert F. Peters, Jr., Merrillville, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

The trial court set aside Richard Lucito's paternity of H.H., and Lucito appeals. Because H.H.'s mother, Ericka Hughes, is estopped from asserting Lucito is not the father of H.H., we must reverse the trial court's order and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

Lucito and Hughes began dating in the fall of 2003. After they began dating, Hughes discovered she was pregnant. Both Lucito and Hughes knew Lucito was not the father. Nevertheless, they began living together and agreed Lucito would be the father. The couple attended birthing classes, and Lucito assisted Hughes during labor. Hughes gave birth to H.H. on April 6, 2004. On April 8, 2004, Hughes and Lucito signed and filed a paternity affidavit naming Lucito as the father of H.H. They lived together until 2006. After the

separation, Lucito provided financial support for H.H. and Hughes and continued to visit H.H.

On April 2, 2007, Lucito petitioned to establish custody, support, and parenting time of H.H. Hughes contested his petition on the ground Lucito is not H.H.'s biological father. Lucito acknowledged he is not the biological father, but asserted he has paternal rights pursuant to the paternity affidavit he and Hughes signed when H.H. was born. The court entered an order that provided:

1) It is undisputed that both parents knew at the time of signing the paternity affidavit that the petitioner was not the biological father of the child, [H.H.] born to the Respondent on April 6, 2004.

2) The Court finds that the paternity affidavit in the case at bar was fraudulently executed by the parties.

3) The Court finds that the paternity affidavit is hereby set aside. Not only did the executing parties not have a reasonable belief that the petitioner was in fact the natural and biological father of the child, but they actually knew he was not the biological father.

4) The Court denies [Lucito's] request for establishment of custody, support and parenting time for the foregoing reasons.

(Appellant's App. at 20.) Lucito filed a motion to correct error, which the trial court denied.

## DISCUSSION AND DECISION

 Today we decide whether a man's paternity may be "revoked" three years after he and the mother knowingly executed a false paternity affidavit. Under the facts of this case, we hold it may not.

 We review the denial of a motion to correct error for an abuse of discretion. *In re Paternity of E.M.L.G.*, 863

N.E.2d 867, 868 (Ind.Ct.App.2007). An abuse of discretion has occurred when the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* However, to the extent we are reviewing the courts' interpretation and application of the paternity statutes, our review is *de novo* because the interpretation of a statute is a question of law. *Id.* Accordingly, we need not give deference to the trial court's determination. *Id.*

The first step in interpreting a statute is to determine whether the Legislature has spoken clearly and unambiguously on the point in question. When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. Clear and unambiguous statutes leave no room for judicial construction. However when a statute is susceptible to more than one interpretation it is deemed ambiguous and thus open to judicial construction. And when faced with an ambiguous statute, other well-established rules of statutory construction are applicable. One such rule is that our primary goal of statutory construction is to determine, give effect to, and implement the intent of the Legislature. To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute. We also examine the statute as a whole. And we do not presume that the Legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result.

*City of Carmel v. Steele,* 865 N.E.2d 612, 618 (Ind.2007).

Paternity can be established only by filing an action under Ind.Code Art. 31–14 or by filing a paternity affidavit in accordance with Ind.Code § 16–37–2–2.1. Ind.Code § 31–14–2–1. Once a man executes a paternity affidavit in accordance with I.C. § 16–37–2–2.1, he "is a child's legal father" unless the affidavit is rescinded or set aside pursuant that same statute. Ind. Code § 31–14–7–3. *See also In re Paternity of E.M.L.G.,* 863 N.E.2d at 869 (where fathers signed affidavits and failed to request genetic tests within sixty days provided by IC 16–37–2–2.1(h), paternity was already established); Ind.Code § 16–37–2–2.1(g) (affidavit "establishes paternity" and commences "parental rights and responsibilities"); Ind.Code § 16–37–2–2.1(m) ("the executed paternity affidavit conclusively establishes the man as the legal father of a child without any further proceedings by a court").

When more than sixty days have passed since the execution of a paternity affidavit, the affidavit may not be rescinded unless a court:

(1) has determined that fraud, duress, or material mistake of fact existed in the execution of the paternity affidavit; and

(2) at the request of a man described in subsection (h) has ordered a genetic test, and the test indicates that the man is excluded as the father of the child.

Ind.Code § 16–37–2–2.1(i).

The trial court rescinded Lucito's paternity affidavit because it was "fraudulently executed." (App. at 20.) We do not believe the legislature intended this statute to be used to set aside paternity affidavits executed by a man and a woman who both knew the man was not the biological father of the child.

Rather, we believe the legislature intended to provide assistance to a man who signed a paternity affidavit due to "fraud, duress, or material mistake of fact." Ind. Code § 16–37–2–2.1(i). A woman who gives birth knows she is the parent of the child, *see In re Paternity of B.M.W.,* 826

N.E.2d 706, 708 (Ind.Ct.App.2005) ("We have always been able to tell with absolute certainty who is the mother of a child."), but men do not have the same certainty. *See Adoptive Parents of M.L.V. v. Wilkens,* 598 N.E.2d 1054, 1059 (Ind.1992) ("Because it is generally not difficult to determine the biological mother of a child, a mother's legal obligations to her child arise when she gives birth. It is more difficult, however, to determine the biological father."). Frequently, the woman is the only one who could know whether more than one man might be the father of her child. Accordingly, a woman always has the information necessary to question paternity prior to signing the affidavit. A man, however, could easily sign an affidavit without awareness of the questionable nature of his paternity; this is the situation we believe the legislature intended to address.

■■■ If mothers could manipulate the paternity statutes in this manner, men would have no incentive to execute paternity affidavits, and thereby voluntarily accept the responsibility to provide for children financially and emotionally, without genetic evidence proving their paternity. If a woman can assert fraud when she and the father defrauded the State Department of Health, she presumably could assert fraud when she *alone* defrauded the Department and the man who signed the affidavit. Under the trial court's holding, a man could maintain his legal relationship with a child in such a situation only if he had genetic proof of his paternity. If a woman may "use" a man to support her and her children until she tires of him, and then "dispose" of him as both partner and father, an unwed father would have no guarantee his relationship with a child could be maintained without proof of a genetic relationship. This could not be the intent of our legislature. Neither could it further the public policy of this State, where "protecting the welfare of children ... is of the utmost importance." *Straub v. B.M.T. by Todd,* 645 N.E.2d 597, 599 (Ind.1994). Therefore, once a mother has signed a paternity affidavit, she may not use the paternity statutes to deprive the legal father of his rights, even if he is not the biological father.[1]

Lucito is the only father H.H. has ever known. He was there when she was born, has provided for her financially and emotionally since her birth, and has continued to visit and support her after his separation from Hughes. He is her legal parent and has assumed all responsibilities attendant thereto. Changing his legal status at this late date is not in the best interests of H.H., Lucito, or our State.

For all these reasons we hold the trial court erred when it "set aside" the paternity affidavit. Neither Lucito nor Hughes may now challenge his paternity. Because Lucito remains the legal father, the court also erred when it denied his request to establish custody, support, and parenting time. We reverse and remand so the court may decide the issues of custody, support, and parenting time between H.H.'s two legal parents.

Reversed and remanded.

KIRSCH, J., and RILEY, J., concur.

---

1. If this is not sufficient disincentive against signing a false paternity affidavit, we note: "A woman who knowingly or intentionally falsely names a man as the child's biological father under this section commits a Class A misdemeanor." Ind.Code § 16–37–2–2.1(f).