## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 25 2020, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas F. Little
Power, Little, Little & Little Law Firm
Frankfort, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.M. (Minor Child) and T.M. (Mother);

T.M. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

September 25, 2020

Court of Appeals Case No. 19A-JT-3103

Appeal from the Clinton Circuit Court

The Honorable Bradley K. Mohler

Trial Court Cause No. 12C01-1902-JT-43

**May, Judge.**

[1] T.M. ("Mother") appeals the juvenile court's order terminating her parental rights to K.M. ("Child") and its denial of her motion to correct error. Mother presents multiple issues for our review, which we restate as:

> 1. Whether Mother's due process rights were violated because the Department of Child Services ("DCS") did not provide services to reunify Mother with Child;

> 2. Whether the juvenile court's findings support its conclusion that the conditions under which Child was removed from Mother's care would not be remedied; and

> 3. Whether the juvenile court abused its discretion when it denied Mother's motion to correct error based on new evidence.

We affirm.

# Facts and Procedural History

[2] Child was born to Mother and C.C. ("Father")[1] on July 15, 2010. Prior to the incident at issue here, Child had been the subject of multiple unsubstantiated reports of neglect, including allegations that she was sexually abused by multiple caregivers. Additionally, Mother had been incarcerated for various convictions of dealing in, and possession of, illegal drugs, as well as battery since Child was born.

---

[1] Father voluntarily relinquished his parental rights to Child and does not participate in this appeal.

[3]     On October 11, 2017, DCS received a report that Child, who was seven years old, had missed twelve days of school and that the school was unable to reach Mother. Two days later, DCS received a report that Child ran in front of a bus and the school again was unable to contact Mother. DCS found Mother, who indicated Child was not living with her, but instead was living with Mother's parents, who lived "here, there and everywhere" because they had lost their home. (Ex. Vol. III at 77.) Mother and Child both provided DCS with an address that "was vacant and had been for several months." (*Id*. at 78.) Child told DCS that she "lived with her brother and sister who were college age and were often drunk and also stays with her Nana and Papa." (*Id*.)

[4]     DCS also received a report that Mother "was potentially using drugs." (Tr. Vol. II at 58.) Child reported, "I have to pee for mommy" and Mother had to stay "at Rico's house for her job [b]ut it is a 'fake job.'" (Ex. Vol. III at 78.) On October 27, 2017, a Family Case Manager ("FCM") from DCS and Mother's parole officer went to the address provided by Mother, but Mother was not at home despite having a scheduled appointment with the parole officer. The parole officer searched Mother's residence and found drugs in the bedroom that Mother shared with Child. The FCM and Mother's parole officer eventually found Mother and Child at the library. Mother admitted using methamphetamine and tested positive for amphetamine, methamphetamine, and THC. Mother subsequently was arrested for a parole violation, and DCS placed Child in foster care, where she has remained through the pendency of these proceedings.

On October 29, 2017, DCS filed its petition to declare Child a Child in Need of Services ("CHINS") in Boone County. The juvenile court held its initial hearing on October 30, 2017, and authorized the continued removal of Child from Mother's care. Mother "failed to maintain contact/report to her parole agent" and also could not be located by DCS from November 10, 2017, to January 9, 2018. (App. Vol. II at 18.) On January 9, 2018, Mother was arrested and later charged with Level 5 felony possession of methamphetamine,[2] Level 6 felony possession of methamphetamine,[3] Class A misdemeanor possession of a controlled substance,[4] and Class C misdemeanor possession of drug paraphernalia.[5] On February 20, 2018, the juvenile court issued its order on the initial hearing, noting Mother had requested counsel and appointing counsel. The order also transferred the case to Clinton County on the court's own motion because "the family are residents of Clinton County." (*Id.* at 28.) The Clinton County court accepted jurisdiction on March 21, 2018.

On March 26, 2018, DCS filed a motion for leave to amend the original CHINS petition "to add new allegations from criminal charges that have arisen since the filing of the [original] petition." (*Id.* at 73.) On May 16, 2018, DCS filed its amended CHINS petition, indicating Mother was incarcerated, Father had not

---

[2] Ind. Code § 35-48-4-6.1(b).

[3] Ind. Code § 35-48-4-6.1(a).

[4] Ind. Code § 35-48-4-7(a).

[5] Ind. Code § 35-48-4-8.3(b).

established paternity, and DCS could not locate Father. The petition also indicated Child had an appointed guardian, M.P., but Child was not in M.P.'s care during the time relevant to the petition and DCS had not yet contacted M.P. On May 25, 2018, the juvenile court held a fact-finding hearing on the CHINS petition during which Mother admitted Child was a CHINS, Father could not be located, and M.P. relinquished all guardianship rights to Child. The juvenile court issued its order adjudicating Child as CHINS on May 30, 2018.

On June 20, 2018, the juvenile court held its dispositional hearing and on June 21, 2018, the court issued its disposition decree. The juvenile court ordered Mother to, among other things: obtain and maintain stable housing and income; refrain from consuming illegal drugs or alcohol; obey the law; submit to random drug screens; follow all terms of probation; complete a substance abuse assessment and follow all recommendations; and attend scheduled visitation with Child. On July 16, 2018, Mother pled guilty to Level 6 felony possession of methamphetamine. The trial court sentenced Mother to 378 days incarcerated with credit for 189 days served. The trial court also revoked Mother's parole and she remained incarcerated during the pendency of these proceedings with a projected release date of January 31, 2020.

When Mother was incarcerated in the Boone County Jail, she completed multiple programs and exercised visitation with Child. In late May 2018, visitation with Child stopped because Child's placement reported behavior issues and anxiety following visits with Mother. Visitation with Mother was

not reinstated. Mother self-reported that while incarcerated she completed her GED and attended parenting and substance abuse rehabilitation classes, in addition to educational classes in cosmetology and the culinary arts. Mother was permitted to communicate with Child via telephone twice a week, but she was sometimes unable to do so due to lack of funds to use the telephone or because Child was unavailable. Mother testified she spoke with Child, on average, two times a month.

[9] On February 8, 2019, DCS filed its petition to terminate Mother's rights to Child based on noncompliance with services and Mother's continued incarceration. The juvenile court held fact-finding hearings on the matter on April 29, 2019, and July 17, 2019. Father appeared at the April 29 hearing and voluntarily relinquished his parental rights. On July 23, 2019, the juvenile court entered its order terminating Mother's parental rights to Child. The juvenile court found, in part:

> [Child] was removed from the home due to [Mother's] parenting issues (not ensuring school attendance) and substance abuse issues. During a short period of non-incarceration in late 2017/early 2018, [Mother] basically disappeared, failing to contact the [Family Case Manager] and failing to have any contact with [Child]. While [Mother] has completed relevant programs during this period of incarceration, there is nothing in the Mother's history to give the Court any confidence that she will remain free of personal issues and substance abuse issues and be able to adequately and safely parent [Child]. The current period of incarceration is at least the fourth time the Mother has been incarcerated and removed from [Child's] life. Despite those

prior absences, the Mother has not made the necessary changes to remedy the issues in her life.

* * * * *

The testimony highlighted the impact of the Mother's lifestyle and decisions on [Child]. For example, [Child] reported that she had to provide urine for the Mother's drug screens. [Child] has been diagnosed with PTSD due to what she observed and the events to which she has been exposed. [Child] has seemingly assumed the role of the parent in the relationship, reporting that she feels responsible for the Mother's incarceration.

Additionally, the Mother is not due to be released for another 6 months, i.e. January 31, 2020. Upon her release, the Mother plans to reside in a half-way house. Thus, even in a best-case scenario, [Child] would not be returned to the Mother's care until well after January 2020. At that point, [Child] would have been removed from the Mother's care for 2 – 2 ½ years or more.

(App. Vol. II at 21-22) (internal citations and footnotes omitted).

[10] On July 25, 2019, Mother filed a motion to correct errors and consider newly discovered evidence. Mother argued that there was not a satisfactory plan for Child's care following termination because DCS filed a motion to change Child's placement shortly after the juvenile court's order terminating Mother's parental rights based on allegations of mistreatment by the foster parents. Based thereon, Mother requested that the juvenile court vacate its order terminating Mother's parental rights to Child and reinstate reunification

services because Mother's projected release date from incarceration was January 31, 2020.

[11] On September 6, 2019, the juvenile court held a hearing on Mother's motion to correct errors. During the hearing, DCS confirmed that Child was removed from her placement and placed with a new pre-adoptive foster family in Indianapolis shortly after the termination of Mother's parental rights. DCS reported Child was doing well in her new placement. On December 5, 2019, the juvenile court denied Mother's motion to correct errors.

# Discussion and Decision

## Standard of Review

[12] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[13] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must

subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g*

*denied.* If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[15] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208. Mother does not challenge the trial court's findings, and thus we accept them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

## 1. Due Process

[16] In a termination of parental rights proceeding, parents have certain due process rights:

> When a State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *E.P. v. Marion County Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 26, 101 S. Ct. 2153, 68 L.Ed.2d 640 (1981) ). Citing *Mathews v. Eldridge*, 424 U.S.

319, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976), this court has recently acknowledged that the nature of the process due in parental rights termination proceedings turns on a balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter County Office of Family and Children*, 734 N.E.2d 1107 (Ind. Ct. App. 2000)[, *reh'g denied*].

*J.T. v. Marion Cty. Office of Family & Children*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *reh'g denied, trans. denied,* a*brogated on other grounds by Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004). In addition, "procedural irregularities in a CHINS proceedings [sic] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *A.P.*, 734 N.E.2d at 1112-13. Mother argues her due process rights were violated when DCS did not provide services to Mother. Mother alleges, "DCS never wanted Mother to reunite with [Child][.]" (Br. of Appellant at 10.)

[17] As an initial matter, we note Mother did not raise this issue before the trial court, and thus the issue is waived. *See McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (parties cannot raise issue for the first time before the appellate court, including some constitutional issues). Waiver notwithstanding, "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009).

Here, there is no evidence that Mother requested services and it is well settled that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Additionally, DCS is not required to offer reunification services or visitation while a parent is incarcerated. *See Rowlett v. Vanderburgh County OFC*, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006) ("[T]he OFC did not, nor was it required to, provide Father with services directed at reuniting him with his children."), *trans. denied*. Based thereon, we conclude Mother's due process rights were not violated by DCS's failure to provide her reunification services with Child.

## 2. Conditions Would not be Remedied

Mother argues the trial court's findings do not support its conclusion that the conditions under which Child was removed from Mother's care would not be remedied. However, Mother does not contest whether the trial court's findings support its conclusion that the continuation of the Mother-Child relationship poses a threat to Child's well-being. DCS does not have to prove both a threat to the child's well-being and a reasonable probability conditions will not be changed, because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that DCS must prove only one by clear and convincing evidence. *See* Ind. Code § 31-35-2-4(b)(2)(B) (listing three options and noting DCS has to prove "one"). Because Mother does not present an argument challenging the trial court's conclusion that the continuation of the Mother-Child relationship would pose a threat to Child, we may affirm under that

portion of the statute and, thus, need not address Mother's argument that the findings do not support the trial court's conclusion that the conditions under which Child was removed would not be remedied. *See In re L.S.*, 717 N.E.2d at 209 (because Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive, court needs to find only one requirement to terminate parental rights).

## 3. Denial of Motion to Correct Error

[20] Our standard of review of a juvenile court's ruling on a motion to correct error is well settled.

> We generally review a trial court's ruling on a motion to correct error for an abuse of discretion. *Jocham v. Sutliff*, 26 N.E.3d 82, 85 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *In re Marriage of Dean*, 787 N.E.2d 445, 447 (Ind. Ct. App. 2003), *trans. denied*. However, where the issues raised in the motion are questions of law, the standard of review is de novo. *City of Indianapolis v. Hicks*, 932 N.E.2d 227, 230 (Ind. Ct. App. 2010), *trans. denied*.

*Ind. Bureau of Motor Vehicles v. Watson*, 70 N.E.3d 380, 384 (Ind. Ct. App. 2017). Our standard of review for appeal of a motion to correct error directs us to consider the underlying judgment, which here is the juvenile court's order terminating Mother's parental rights to Child. *See In re Paternity of H.H.*, 879 N.E.2d 1175, 1177 (Ind. Ct. App. 2008) (review of motion to correct error includes review of underlying order). Specifically, Mother challenges the

juvenile court's conclusion that there existed a satisfactory plan for Child's care following termination of Mother's parental rights.

[21] Pursuant to Indiana Code section 31-35-2-4(b)(2)(D), parental rights cannot be terminated unless DCS provides sufficient evidence of a satisfactory plan for the care and treatment of the child following termination. We have long held the post-termination permanency plan "need not be detailed, so long as it offers general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d at 268. Here, DCS presented evidence and the juvenile court found that "adoption" was the plan for Child's care following the termination of Mother's parental rights. (App. Vol. II at 25.)

[22] Following the juvenile court's order terminating Mother's parental rights, DCS filed a motion to change Child's placement based on allegations of abuse at her foster placement. While the allegations were unsubstantiated, they included reports that Child was being treated worse than other children in the foster parents' care, foster parents were withholding food from Child as a form of punishment, and foster mother told Child she "is going to turn out like her mother and 'end up in jail.'" (App. Vol. II at 36.) The trial court granted DCS's motion to change Child's placement and Child was placed with a pre-adoptive family in Indianapolis.

[23] In her motion to correct error, Mother asked the juvenile court to reverse its decision to terminate her parental rights to Child because a change in placement

would further delay permanency for Child. Mother asserted that DCS "intentionally waited until after the Termination of Parental Rights Hearing and after the Court issued the Order Terminating Parental Rights to request [Child's placement] change[,]" and "had the Court, Mother and counsel for Mother been made aware of this course of action, the Court's order may have denied the Petition to Terminate[.]" (*Id.* at 31.) Mother stated the change in placement controverted the juvenile court's order where it stated, "Any further delay in providing [Child] permanency will pose a threat to [Child's] well-being. The need for permanency is certainly a factor in determining whether termination is in [Child's] best interest." (*Id.* at 24.) Mother also argued that her projected release date from incarceration was "only six (6) months" away, which was a "reasonable timeframe for reunification with Mother." (*Id.* at 32.)

[24] In response, DCS argued:

> [Child's] new foster family is ready to adopt her. She is doing well in the placement, [Child] calls them mom and dad, and the foster parents have already retained a lawyer to file the adoption petition. [Child] has not displayed any negative behaviors at this new placement and therefore it is not a less permanent placement. In fact, it is more stable and more permanent than the [former foster family].

(*Id.* at 49-50.) DCS also noted that

> [Mother] testified that she believed she would be entering the Community Transition Program through her criminal case. However, on July 22, 2019, Boone Circuit Court denied her petition to enter said program . . . . As such, [Mother's] position

> is even weaker in her ability to demonstrate that she can provide
> a safe and stable environment for [Child].

(*Id*. at 49.)

[25] The juvenile court held a hearing on Mother's motion to correct error on September 6, 2019, and summarily denied it on December 5, 2019. On appeal, Mother argues the juvenile court abused its discretion when it denied her motion to correct error because "[s]imply moving a child from one foster home to the next is not an acceptable means of permanency, especially when [Mother] was so close to being released from incarceration." (Br. of Appellant at 22.) However, "[a]ttempting to find suitable parents to adopt the children is clearly a satisfactory plan. The fact that there was not a specific family in place to adopt the children does not make the plan unsatisfactory." *Lang v. Starke C'ty Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007) (citations omitted), *trans. denied*. As DCS presented evidence that Child was in a pre-adoptive home following the change in placement, we conclude the juvenile court did not abuse its discretion when it denied Mother's motion to correct error. *See In re B.D.J.*, 728 N.E.2d at 204 (affirming post-termination plan wherein foster parents had "expressed some interest" in adopting children, but "[i]f that does not work out . . . the children have already been turned over to the special needs adoption team and their names have been placed there").

# Conclusion

Mother's due process argument is waived for failure to present it to the juvenile court. Waiver notwithstanding, she cannot challenge a termination order based on inadequacy of services. Additionally, we need not address her argument that the juvenile court's conclusion that the conditions under which Child was removed from Mother's care would not be remedied because Mother did not challenge the court's conclusion that the continuation of the Mother-Child relationship would pose a threat to Child's well-being. As the statute is written in the disjunctive, DCS needed to prove only one of these two factors. Finally, the juvenile court did not abuse its discretion when it denied Mother's motion to correct error based on a change in Child's placement because the new placement was still a satisfactory plan for Child's post-termination care. Accordingly, we affirm.

Affirmed.

Riley, J., and Altice, J., concur.